OPINION OF THE COURT
David B. Saxe, J.
The court holds that in failing to properly consider the *488 petitioners for kinship foster care benefits, both the City (the Human Resources Administration) and the State (the Department of Social Services) acted irrationally, irresponsibly, and inequitably.
This petition is brought by three sisters who agreed to take into their homes the four small children of their sister, Rhonda Greer, and who now seek, in return, the kinship foster care benefits allegedly promised to them by New York City Human Resources Administration’s Child Welfare Administration (together, the Agency). The petition follows a determination of the New York State Department of Social Services (the State), made after a Fair Hearing, in which the State found that the Agency was correct in denying benefits to the petitioners. The present petition is aimed both at the vacatur of the State’s determination, and for an award of damages for, or for specific performance of, the alleged agreements between the Agency and petitioners for the provision of kinship foster care benefits. There is also a motion seeking intervention in the present proceeding on the part of Alma Mitchell, who claims she also was denied kinship foster care benefits allegedly promised to her by the Agency, for the care of her grandnephew, Shawn Cady.
In late 1985 Rhonda Greer’s three oldest children, Hydassah, born August 1978, Hannah, born January 1980, and Elisha, born February 1982, were found alone, locked in their mother’s apartment, where a fire had been reported. The Agency allegedly had been called to the scene in order to take custody of the children from Rhonda Greer, who is alleged to be addicted to crack cocaine.
A fourth Greer sister, not a party to this proceeding, Sylvia Greer, was also called to the scene, and agreed to take the children herself, in order to prevent their placement with strangers. She obtained an order of temporary custody for all three children from Kings County Family Court on December 3, 1985.
In January 1986, Sylvia Greer, who had two children of her own, returned Rhonda’s three children to the Agency because she alleges the Agency had failed in its promise to provide her with the financial assistance she urgently required for five children. No documentation accompanied the transfer of the children to the Agency, and the court’s order granting custody to Sylvia expired in March 1986.
The Agency then called upon Cynthia Greer, single, work *489 ing and 24 years old, and Teresa Greer, mother of two, to take in Rhonda Greer’s children. Both sisters allegedly were assured that they would receive appropriate foster care benefits eventually, but would have to be content with public assistance for the children during the six months to one year it would require to process their foster care applications. Cynthia claims that she was told that the children would most likely suffer abuse in a group home if she refused her aid. Cynthia subsequently agreed to take Elisha and Hydassah, while Teresa took in Hannah. Both sisters maintain that they only agreed to take the children in because they were promised adequate financial support, in the form of kinship foster care benefits.
While the sisters eventually obtained public assistance for their charges, they did not obtain foster care benefits for nearly six years, although they repeatedly requested the aid, and allegedly were informed on several occasions that their applications were pending.
In March 1991, Rhonda Greer gave birth to a son, Caliph Greer, who was born with syphilis and conjunctivitis, and addicted to cocaine. Rhonda Greer abandoned Caliph in the hospital.
Petitioner Sandra Greer, who works to support herself and her husband upon limited means, agreed to take Caliph if foster care benefits were provided. As in the case of Cynthia and Teresa, Sandra allegedly was promised foster care benefits, and was led to believe her application was being processed.
By April 1991, it became apparent to the petitioners that no foster care benefits would be paid, despite the Agency’s assurances, and Rhonda’s abandonment of Caliph. The petitioners’ individual requests for Fair Hearings on the matter of the Agency’s denial of kinship of foster care benefits were consolidated into a single Fair Hearing, which resulted in a determination in the Agency’s favor.
The State reviewed the steps required by law prior to placing children in foster care, and determined that Rhonda Greer’s children never entered into the foster care system, because they were never legally removed from the custody of their mother, and placed in the custody of the Commissioner (acting through the Agency). The State reasoned that since the taking of custody by the Commissioner, either by accepting the parent’s voluntary relinquishment of custody, or by *490 court order, is the basic prerequisite to a child becoming a foster child, the petitioners never became foster parents, and never became eligible for benefits.
The State found that the petitioners had agreed instead to take in their sister’s children as an alternative to foster care, rather than risk that the children be placed with strangers. This finding was made despite the fact that the petitioners, according to the State, agreed to take the children on the basis of their understanding that the Agency would process applications for foster care, and despite the fact that the Agency had agreed to process the applications. The State found no evidence that the Agency ever really intended to obtain custody of the children, despite what the petitioners had been made to believe, but concluded that it did not have the jurisdiction to review "whether the Agency correctly exercised its discretion in determining not to obtain the care and custody of these children.”
During the pendency of the hearing, Rhonda Greer allegedly attempted to transfer custody of her children to the Agency voluntarily, but the Agency chose not to act upon the ofier. No steps were taken by the Agency to obtain custody, despite the birth and abandonment of Caliph, until September 1992, when Rhonda Greer gave birth to her fifth child, and her second born addicted to cocaine. According to the Agency, custody of the four children who are the subject of this petition has now been acquired by the Agency, upon court order, and the petitioners have finally been approved as foster parents, and have been receiving foster care benefits, since October 1992.
The term "foster child” applies to any person "in the care, custody or guardianship of an authorized agency, who is placed for temporary or long-term care” (Social Services Law § 371 [19]). Therefore, the acquisition of custody by the authorized agency is, as the State points out, an essential prerequisite to any foster care arrangement.
The agency acquires custody of a child by one of two methods, by the voluntary transfer of custody from the parent or guardian by means of a written agreement, as set forth in Social Services Law § 384-a, or by the transfer of custody to the agency by an order of the Family Court pursuant to Family Court Act articles 3, 7, and 10.
Before the agency can accept the voluntary transfer of custody from the parent or guardian, it must first conduct an *491 investigation to determine, inter alla, "whether the child may appropriately be placed with a suitable person related to the child and whether such relative seeks approval as a foster parent pursuant to this chapter for the purposes of providing care for such child, or wishes to provide care and custody for the child until the parent * * * is able to resume custody” (Social Services Law § 384-a [1-a] [a]). The agency is directed by its regulations to "attempt prior to the placement of a child in foster care to locate adequate alternative living arrangements with a relative or family friend which would enable the child to avoid foster care placement,” unless the child is placed as a result of a court order or a surrender agreement pursuant to Social Services Law § 384 (as opposed to an agreement voluntarily turning care and custody over to the agency under section 384-a) (18 NYCRR 430.10 [b] [2]).
The State Department of Social Services in 1986 issued Administrative Directive 86 ADM-33 to set forth guidelines as to the use of relatives as foster care providers or as alternatives to foster care placements, recognizing that "[Relatives who provide foster care have historically been granted special consideration in the foster care system due to the special continuity of significant relationships they provide for a child” (86 ADM-33, at 2).
The bulk of the Administrative Directive is concerned with the certification of relatives as foster care providers. Alternatives to foster care placement are only appropriate, according to the Directive, when a child is not "in serious danger,” and is "not in need of foster care” (id., at 17). Alternative living arrangements are characterized as "a positive alternative to foster care placement” if they offer among other things, a "continuity of positive relationships that are emotionally and psychologically significant to the child,” and a "healthy, secure, and nurturing” environment with a relative who "has the resources to provide adequately for the child’s physical, medical and social needs,” and who also has "adequate financial resources,” or is willing to make application for Aid to Dependent Children or Home Relief (id., at 17-18). Because in the alternative to placement situation, "the parent remains the legal guardian and the district merely facilitates the movement of the child from the natural parent’s home to the alternative living arrangement without assuming custody” (ibid.), the alternative living arrangement is most likely to be appropriate in "emergency situations,” where the agency requires time to assess the child’s need for foster placement, *492 in "temporary or short-term situations,” where the parent and relative are willing that the alternate living arrangement be made, or in situations lacking in urgency (id., at 18).
A determination of an administrative agency will only be overturned if it is shown to be arbitrary and capricious or without rational basis (Matter of Ista Mgt. v State Div. of Hous. & Community Renewal, 161 AD2d 424, 426). An agency’s actions are not sacrosanct merely because the agency has discretion in the matter, since an arbitrary exercise of discretion is subject to judicial review (Matter of Italian Sons & Daughters v Common Council, 89 AD2d 822, 823). It is proper, therefore, to review the State’s determination to see if it has a rational basis in light of the statutory scheme concerning the granting of foster care benefits.
The State’s determination should be vacated because it defers unreasonably and irrationally to the discretion of the Agency, without regard to the Agency’s duty, implied in the law, to act in some reasonable fashion on a relative’s expectations of receiving foster care benefits. The determination is irrational because it permits the Agency to circumvent the requirements of the Social Services Law and State guidelines by using misinformation and misrepresentation to coerce relatives of children in need to become uncompensated custodians of children under "alternative living arrangements” when the relatives have clearly expressed their unwillingness or inability to accept such an arrangement, and, in fact, have no idea that such a designation has been made.
It is this court’s finding that the Agency had a mandatory duty under Social Services Law § 384-a (1-a), and the State guidelines and regulations, to address petitioners’ requests for foster care benefits in some meaningful way, especially in light of the Agency’s agreements to "process” applications for foster care benefits.
Section 384-a (1-a) of the Social Services Law requires the Agency, upon locating a "suitable” relative, to determine whether that person "seeks approval as a foster parent” or wishes to provide care and custody, presumably on a nonfoster care basis, as a temporary measure. It should be recalled that the willingness to take on the role of an "alternative” caretaker, and an understanding of the requirements of that role, are a prerequisite to "suitability” as an "alternative” to foster care under the State’s own guidelines. Therefore, relatives who expect to receive foster care benefits, because of represen *493 tations made to them by the Agency, or because of a lack of understanding of the circumstances, might not be "suitable” alternative caregivers. Certainly this might be the case where a relative expressly states that she cannot accept care of the children without foster care benefits due to her financial situation.
Section 384-a (1-a) does not specify what steps the Agency must take once it determines that the "suitable” relative it has located desires, or believes she requires, foster care benefits in order to care for a child, but the section would be meaningless if it allowed the Agency to ignore the information by never acting upon it, or, worse still if the Agency was permitted to exploit the information, along with the relatives’ natural concern for related children, by holding out foster care benefits as an inducement to the relative to accept, unknowingly, an uncompensated "alternative living arrangement.”
The Agency might indeed have broad discretion to determine whether it is advisable or necessary in any given situation to acquire the care and custody of a child for purposes of foster care placement, depending upon, among other things, whether a child’s health and safety are, or have been placed at risk as a result of the failure of his or her parents to exercise a minimum degree of care (see, 18 NYCRR 430.10 [c] [1]). However, just because the State’s regulations require the Agency to look into alternatives to foster home prior to placement (18 NYCRR 430.10 [b]), the Agency does not have discretion to abandon any further investigation into the needs of the child for foster placement once it locates a relative who can be convinced, by legal means or otherwise, to take in the child on an emergency basis. This is especially so when the State’s guidelines exclude from "alternative” custody arrangements any child who, "is or has been in serious danger” or where "it is assessed that the remedies of the Family Court are necessary to ensure the protection of the child and/or the best interests of the child” (NYS Dept of Social Servs Administrative Directive, 86 ADM-33, at 17).
The State in its determination found no evidence that the Agency ever intended to obtain custody of Elisha, Hydassah or Hannah (or, presumably, Caliph) despite its promise to "process” petitioner’s applications for benefits. Obviously, the Agency had no intention of processing anything, since it admits outright in its opposition that it never intended to *494 obtain custody over the children, nor took any steps to obtain custody.
The record shows nothing to indicate that the Agency took any steps whatsoever to determine whether the children were candidates for foster care once their immediate need for shelter was satisfied, despite the petitioners’ pleas for aid. There does not appear to have been any determination as to whether the children could safely, or legally, remain in Rhonda Greer’s custody or whether Rhonda Greer had compromised her children’s safety. Such a determination would necessarily predate placement in an alternative custody arrangement, under the State’s guidelines. The Agency abused its discretion, and acted irrationally, in placing the Greer children in "alternative living arrangements” without significant bases.
The Agency also abused its discretion by failing to take any steps to determine the feasibility of, or necessity for, foster care placement with the petitioners after they made their feelings on the matter clear. If the Agency had already determined when it approached the petitioners that they would accept the children as an uncompensated alternative to foster care, there was then nothing for the Agency to "process” by way of obtaining foster care benefits for the petitioners, and so the petitioners should have been informed as to their true status. If there was still an issue as to whether foster care placement was necessary, or as to whether the petitioners would qualify as foster parents under 18 NYCRR 444.8, then some concrete steps should have been taken towards a final determination, and the petitioners were entitled to be informed as to the outcome.
Both the State and the Agency appear to believe that the petitioners knowingly accepted custody of the children without compensation because their "paramount interest” was in keeping the children together with the family, as well as out of a fear, engendered by the Agency, that the children might otherwise be placed in nonrelative, and possibly dangerous foster homes.
There is no evidence in the record that the petitioners ever accepted the children on a noncompensated basis, and every indication that they did not. The fact that they might have, had the facts been presented to them without misrepresentation, is irrelevant. And, in all truth, there is no indication whatsoever to support a reasonable belief that the petitioners *495 would have been passed over as foster parents, considering their expeditious qualification in 1992, and the State’s strong policy of placement of children, if at all possible, with their relatives. In fact, the implication which the State makes in its decision, that relatives primarily concerned with the safety of related children somehow disqualify themselves for foster care benefits, is unfortunate and distasteful. A relative whose financial means are limited is no less caring because she requires financial aid before accepting more children into her home. Such people should not be taken advantage of in the manner in which the Agency appears to have taken advantage of the petitioners.
The State, in deferring unquestionably and absolutely to the Agency’s "discretion” in determining not to obtain care and custody of Rhonda Greer’s children, gave the Agency free reign to act without regard to its duties under the law, in an irrational, irresponsible and inequitable manner. By finding that the petitioners somehow acquiesced to noncompensated alternative living arrangements due to their "paramount interest” in keeping their family together, and despite their unwillingness to take the children without foster care benefits, the State acted with disregard to the facts and the requirements of the law. Therefore, the State’s determination must be vacated.
This is not to say that the petitioners have an established right to foster care benefits, but only that the Agency failed to properly determine whether such a right existed. The Agency apparently never took any steps to investigate and arrive at a determination of the children’s need for the Agency’s protection, by means of the acquisition of custody. The Agency never made any determination prior to 1992 as to the petitioners’ fitness to become the children’s foster parents. The petitioners, and the Greer children, were entitled to these determinations. A rationally based finding that the children were not endangered in the custody of Rhonda Greer, or that petitioners were not fit to be foster parents to the children, would render petitioners ineligible for retroactive benefits. There has been no findings as to whether a proper handling of the matter would have resulted in the granting of benefits to petitioners at any time prior to 1992, and so this question must be remanded to the State for further hearings.
Petitioners also seek contract damages or specific performance against the Agency in their fifth and sixth claims, and damages based on the Agency’s alleged failure to petition the *496 Family Court to approve a voluntary placement agreement submitted by Rhonda Greer in November 1991, and on the alleged contracts which arose in 1986 and 1991 when the petitioners each took in one or more of Rhonda’s children. The estoppel claim rests on the petitioners’ alleged reliance on the representations made to the petitioners by the Agency, which the petitioners characterize as promises to pay foster care benefits.
The contract and estoppel claims do not state causes of action. The record resulting from the Fair Hearing does not establish that any actual promises to pay, or to secure custody were made, but only that the petitioners’ applications would be "processed.” The Agency could not, by law, promise foster care benefits to petitioners until all necessary steps had been taken to bring the children into the foster care system, and to certify petitioners as foster parents. Until all legal requirements are met, no right to foster care benefits existed, and there was no guarantee that all of the requirements would be met. Therefore, there could be no binding agreement to pay benefits arising from the Agency’s promise to process the petitioners’ applications, and there could be no reasonable reliance on petitioners’ part on representations that foster care benefits would follow. The proper adjudication of the matter of whether petitioners should have been approved to receive foster care benefits is properly left to the Agency.
The motion for intervention is denied. Alma Mitchell’s motion for permission to intervene is premised upon the similarities allegedly existing between her claim for kinship foster care benefits, and petitioners. Alma Mitchell allegedly was induced to take in her grandnephew Shawn Cady shortly after his birth in July 1986, by the promise of foster care benefits. No benefits were paid until February 1992.
All of the parties cite to CPLR 1013 for the standards for permissive intervention, which require that there be common questions of law or fact before intervention will be permitted. However, intervention in a CPLR article 78 proceeding is governed by a different standard, set forth in CPLR 7802 (d), which only requires that the intervenor be "interested” in the proceeding (see, Matter of Helms v Diamond, 76 Misc 2d 253, 255).
Although the issue raised in the case of Alma Mitchell has points of similarity with petitioners’ claims, Alma Mitchell is not "interested” in petitioners’ rights to receive foster care *497 benefits, and nothing would be gained by her intervention. Further, the facts in Alma Mitchell’s case have not been developed, and no Fair Hearing has yet been held to determine her rights to benefits. A Fair Hearing, in which the Agency’s duty to follow through on a relative’s request for foster care benefits is addressed, might result in the award of the retroactive benefits to which Alma Mitchell believes she is entitled. She should proceed with her administrative remedies before approaching the court for relief (see, Matter of Caso v New York State Pub. High School Athletic Assn., 78 AD2d 41, 45).
Accordingly, the petition is granted insofar as the determination of the Commissioner of Social Services is vacated and the matter remanded to the Commissioner for a determination as to whether petitioners would have been certified to receive foster care benefits had the Agency properly pursued the matter of whether the Greer children should enter foster care and whether the petitioners, upon receipt of the children or any time thereafter, should have been certified as foster care providers.
The claims for contract damages or specific performance or estoppel damages are all dismissed.
The motion to intervene is denied.